IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| TROY MATTOS and JAYZEL MATTOS, | ) ) ) | CV. NO. 07-00220 DAE BMK |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| DARREN AGARANO, RYAN AIKALA, STUART KUNIOKA, HALAYUDHA MACKNIGHT, MAUI COUNTY, and JOHN DOES 1-10, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART WITHOUT
PREJUDICE COUNTY DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO LIABILITY OF DEFENDANTS DARREN
AGARANO, RYAN AIKALA, STUART KUNIOKA, AND HALAYUDHA
MACKNIGHT FOR VIOLATIONS OF PLAINTIFFS'
<u>CONSTITUTIONAL RIGHTS</u>

On February 19, 2008, the Court heard Plaintiffs' and Defendants'

cross Motions for Summary Judgment.  Eric Seitz, Esq., and Della A. Belatti, Esq.,

appeared at the hearing on behalf of Plaintiffs; Laureen Martin and Moana Lutey,

Deputies Corporation Counsel, appeared at the hearing on behalf of Defendants.

After reviewing the motions and the supporting and opposing memoranda, the

Court GRANTS IN PART and DENIES IN PART WITHOUT PREJUDICE

County Defendants' Motion for Summary Judgment and DENIES Plaintiffs'

Motion for Partial Summary Judgment as to Liability of Defendants Darren

Agarano, Ryan Aikala, Stuart Kunioka, and Halayudha MacKnight for Violations

of Plaintiffs' Constitutional Rights.

BACKGROUND

On April 26, 2007, Troy and Jayzel Mattos filed a Complaint (Doc.

# 1) for Damages against County Defendants[1] alleging violations of both federal

and state constitutional rights and requesting general, special, and punitive

damages pursuant to 42 U.S.C. § 1983.

Plaintiffs' suit is based on events that transpired on August 23, 2006.

At approximately 11:20 p.m. that evening, Officers Agarano, Kunioka, and

MacKnight[2] responded to a 911 call regarding domestic abuse at 1849 Piihana

Road in Wailuku, Maui (the "Mattos residence" or "residence").  The 911 call was

made from within the residence by Cheynice Ruidas ("Cheynice"), the 14- year-old

daughter of Plaintiff Jayzel Mattos ("Jayzel").  Cheynice had informed the 911

---

[1] Defendants Agarano, Aikala, Kunioka, and MacKnight are officers with the Maui Police Department.  They will be referred to collectively as "Officers."

[2] Officer Aikala overheard the assignment on his police radio and decided on his own volition to respond.

2

operator that her parents were in a physical fight and that she heard things being thrown around.  (Decl. of Denise Nakanishi-Andre ("Nakanishi-Andre Decl."), Ex. F ¶¶ 3-7, attached to Defs.' Mot. in Opp'n to Pls.' Mot. for Summary Judgment.) Officers Agarano, MacKnight, and Kunioka arrived at 11:28 p.m., approximately eight minutes after the 911 call.  Officer Aikala arrived at approximately 11:30 p.m.

As the Officers approached the residence they observed Troy Mattos ("Troy") sitting on top of the outside stairs next to two beer bottles.  According to the Officers, Troy smelled of alcohol, his eyes were red and watery, and he appeared intoxicated.  Officer Kunioka informed Troy that they had received a call about an altercation at that location and asked Troy what had occurred.  Troy replied that he and Jayzel had been in an argument but denied a physical altercation.  Officer Kunioka inquired as to the whereabouts of Jayzel and Troy replied that she was in the shower.  Officer Kunioka informed Troy that he needed to speak with Jayzel to ensure she was not harmed.  Troy is described by Officer Kunioka during this interaction as apprehensive and agitated.  (Decl. of Stuart Kunioka ("Kunioka Decl."), Ex. B ¶ 16, attached to Defs.' Mot. in Opp'n to Pls.' Mot. for Summ. Judg.)

3

Troy then went to retrieve Jayzel from inside the residence.  While doing so, there was apparently a call out for Jayzel two times with no response. Troy then entered the residence, told the Officers to wait outside the dwelling, and shut the screen door behind him.  Officer Agarano, concerned that Troy's actions and behavior might constitute a serious safety threat to people inside the residence, particularly Jayzel, as well as to the responding Officers, opened the door and stepped into the doorway.  (Decl. of Darren Agarano ("Agarano Decl."), Ex. D ¶¶ 12-13, attached to Defs.' Mot. in Opp'n to Pls.' Mot. for Summ. Judg.)

Shortly thereafter, Troy returned with Jayzel.  Upon seeing Officer Agarano inside the residence, Troy became further upset and ordered Officer Agarano out.  Officer Agarano informed Troy that police had authority to enter a home to investigate domestic disturbance cases. (Police Report, Ex. 1 at COM 0017, attached to Pls.' Mot. for Summ. Judg.)  While the details are disputed by the parties, the exchange between Troy and Officer Agarano escalated.  At some point during the exchange, Officers Aikala and Kunioka also entered the premises.

After Troy allegedly swore and moved toward the Officers, Officer Agarano informed Troy that he was being placed under arrest.  (Agarano Decl. ¶ 18.)  Jayzel then moved in front of Troy in an attempt to prevent his arrest. While the subsequent details are again disputed, Jayzel was apparently ordered to

4

move away from Troy and refused.  Officer Aikala drew his Taser and warned

Jayzel that he would use the Taser on her if she did not move away.  Officer Aikala

attempted to pull Jayzel away from Troy but was unsuccessful.[3]  Officer Aikala

stepped back and deployed his Taser, which caused Jayzel to fall to the ground.

   At this point, Troy became even more agitated, yelling at the Officers

for using the Taser on Jayzel.  Officers Agarano and MacKnight, who had entered

the residence, attempted to restrain Troy.  After a brief struggle, the Officers

handcuffed Troy.

   Troy and Jayzel were taken into custody and charged with harassment

and resisting arrest and harassment and obstructing government operations,

respectively.  On January 30, 2007, Judge Kelsey T. Kawano of the Second Circuit

Court, Wailuku Division, dismissed the criminal charges against Jayzel.  While

unclear, it appears that the criminal charges against Troy were also dropped.

   On October 5, 2007, Plaintiffs filed the instant Motion for Partial

Summary Judgment ("Plaintiffs' Partial MSJ") (Doc. # 36) on the limited issue of

the Officers' liability for constitutional violations.  Defendants opposed Plaintiffs'

MSJ on January 4, 2008 (Doc. # 78), to which Plaintiffs replied on January 11,

---

   [3] Defendants also allege that Jayzel shoved Officer Aikala in the chest, which she denies.

2008 (Doc. # 87).  On January 10, 2008, Defendants filed a Motion for Summary

Judgment ("Defendants' MSJ") (Doc. # 81), which Plaintiffs opposed on February

1, 2008 (Doc. # 99).  On February 8, 2008, Defendants replied (Doc. # 101).

STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); see also Porter v. Cal. Dep't of Corrections, 419 F.3d 885, 891 (9th

Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A

main purpose of summary judgment is to dispose of factually unsupported claims

and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

323.  A moving party without the ultimate burden of persuasion at trial has both

the initial burden of production and the ultimate burden of persuasion on a motion

for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d

1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to

identify for the court those "portions of the materials on file that it believes

6

demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings. Porter, 419 F.3d at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers. S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties."). "[A]t least some 'significant probative evidence'" must be produced. T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id.  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

<u>DISCUSSION</u>

I.  <u>Defendants' MSJ</u>

The Court addresses Defendants' MSJ first.  Defendants move for summary judgment on the following bases: (1) entry into the residence was constitutional based on either exigent circumstances, the "emergency exception," and/or implied consent; (2) the Officers are entitled to qualified immunity; (3) Troy's arrest was proper; (4) there was probable cause to arrest Jayzel; (5) the use of the Taser was not excessive; (6) Plaintiffs' § 1983 claim against the County is without merit; (7) the state law claims against the County are without merit; and

8

(8) punitive damages are not warranted.  For purposes of their opposition to Defendants' motion, Plaintiffs adopt and reassert all of their arguments contained in their Partial MSJ and in their motion to amend the scheduling order.  In addition, Plaintiffs argue that summary judgment is inappropriate because Defendants have refused to produce relevant documents, specifically those pertaining to the Officers' personnel files and training records.[4]  For purposes of the instant discussion, the Court examines Defendants' first through fifth arguments, all of which relate to the liability of the individual Officers, as part of its analysis of whether qualified immunity applies here.  The Court addresses arguments six through eight, which pertain to the liability of Maui County (the "County"), separately.

A.  Section 1983

Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

---

[4] The discovery issue was to be heard by Magistrate Judge Barry M. Kurren on February 19, 2007 at 11:00 a.m. and the Court is now advised the issues have largely been resolved.

> the party injured in an action at law, suit in equity, or
> other proper proceeding for redress[.]

42 U.S.C. § 1983.  Thus, the essential elements to be proved in any § 1983 action

are: (1) that the defendant was acting under color of state law in the actions

complained of, and (2) that the defendant deprived plaintiff of a right, privilege or

immunity secured by the Constitution or laws of the United States.  Briley v. State

of California, 564 F.2d 849, 853 (9th Cir.1977).

    B.  Qualified Immunity

The first question that this Court must resolve is whether the Officers

are entitled to qualified immunity for their actions on the night of August 23, 2006.

The Supreme Court has recognized that qualified immunity "provides ample

support to all but the plainly incompetent or those who knowingly violate the law,

protecting officers from violations of constitutional magnitude.  Case v. Kitsap

County Sheriff's Dept., 249 F.3d 921, 926 (internal quotations and citations

omitted).  As long as the official's "conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known,"

he or she has qualified immunity from civil liability under § 1983.   Spoklie v.

Montana, 411 F.3d 1051, 1060 (9th Cir. 2005). In determining whether the

Officers are entitled to qualified immunity here, this Court must ask two questions:

(1) Was the law governing the Officers' conduct clearly established? (2) Under that law, could a reasonable officer believe that the conduct was lawful?  <u>Case</u>, 249 F.3d at 926.

Only the second prong of the qualified immunity analysis is at issue here, as there is no dispute that Plaintiffs' Fourth Amendment rights were "clearly established."[5]  The Court therefore analyzes the three events of August 23, 2006 – the entry of the residence, the arrest of Plaintiffs, and the use of the Taser on Jayzel – to determine whether the Officers could have reasonably believed their conduct with respect to each event was lawful.

### 1.  The Entry of the Residence

A warrantless entry into a home is per se unreasonable and, absent exigency or consent, violates the Fourth Amendment.  <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980); <u>Steagald v. United States</u>, 451 U.S. 204, 211 (1981); <u>see</u> <u>also</u> <u>United States v. United States Dist. Court</u>, 407 U.S. 297, 313 (1972) (noting that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed").  Exigent circumstances exist when the persons involved or the law enforcement process would face a substantial risk of harm if

---

[5] While unclear, it appears Plaintiffs allege only violations of the Fourth Amendment for purposes of their Partial MSJ.

the police delayed a search until a warrant could be obtained.  Exigent

circumstances necessarily imply that there is insufficient time to get a warrant.

United States v. Warner, 843 F.2d 401, 403 (9th Cir. 1988); United States v.

Brock, 667 F.2d 1311, 1318 (9th Cir. 1982).  "The need for the search must be

readily apparent to the police and so strong that it outweighs the important Fourth

Amendment protections provided by the warrant requirements."  Brock, 667 F.2d

at 1318 (emphasis added).  Examples of exigent circumstances include preventing:

(1) physical harm to the officers or others; (2) destruction of evidence; (3) the

escape of suspects; or (4) some other consequence that improperly frustrates

legitimate law enforcement efforts.  Warner, 843 F.2d at 403.

Whether exigencies exist justifying a search without a warrant is

examined objectively.  See Mincey v. Arizona, 437 U.S. 385, 393-94 (1978)

("warrants are generally required to search a person's home or his person unless

'the exigencies of the situation' make the needs of law enforcement so compelling

that the warrantless search is objectively reasonable under the Fourth

Amendment"); Scott v. United States, 436 U.S. 128, 137 (1978) ("almost without

exception in evaluating alleged violations of the Fourth Amendment the Court has

first undertaken an objective assessment of an officer's actions in light of the facts

and circumstances then known to him"); United States v. Suarez, 902 F.2d 1466,

1468 (9th Cir. 1990) (holding that more than the officer's subjective intent is required to demonstrate exigent circumstances). "The question whether exigent circumstances exist is largely a factual one." Brock, 667 F.2d at 1318. The exigencies are examined under the "totality of the circumstances known to the officer at the time of the warrantless intrusion." Warner, 843 F.2d at 403; see also United States v. Sarkissian, 841 F.2d 959, 962 (9th Cir. 1988); U.S. v. Licata, 761 F.2d 537, 543 (9th Cir. 1985).

Furthermore, the Ninth Circuit has recognized that "the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy." United States v. Brooks, 367 F.3d 1128, 1136 (9th Cir. 2004). Courts have recognized the "combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." Id. (internal quotations omitted). The Ninth Circuit, however, has stopped short of holding that domestic abuse cases create a per se exigent need for warrantless entry. United States v. Black, 482 F.3d 1035, 1040 (9th Cir. 2007) (internal citation omitted). The test to determine exigency is an individualized assessment of the circumstances on a case-by-case basis. Id.

13

Plaintiffs separately challenge the entries of Officer Agarano, who entered the residence first, Officers Aikala and Kunioka, who entered upon hearing Troy yelling at Officer Agarano, and Officer MacKnight, who entered after Jayzel had been incapacitated by the Taser. The Court will examine these entries in the order they occurred.

a. <u>Officer Agarano's Entry</u>

The facts available to Officer Agarano at the time he entered the residence were as follows: (1) he was responding to a domestic abuse call (Agarano Decl. ¶ 3.); (2) the caller had reported that there was a *physical altercation* occurring and that "things were being thrown around" (Nakanishi-Andre Decl. ¶¶ 4-5.); (3) upon arrival, he observed Troy near two beer bottles (<u>Id.</u> ¶ 6.); (4) Troy admitted being in an argument with Jayzel but denied a physical altercation (Kunikoa Decl. ¶¶ 11, 13.); (5) Troy appeared intoxicated and was calm but arrogant and evasive (Agarano Decl. ¶ 8.); (6) Troy became increasingly agitated and upset with the Officers' questioning (<u>Id.</u>); (7) there was no response when Troy called out to his wife twice (Decl. of Troy Mattos ("Troy Decl."), Ex. N at 53, attached to Defs.' Mot. in Opp'n to Pls.' Mot. for Summ. Judg.); and (8) prior to entering the residence, Troy told Officer Agarano to wait outside (<u>Id.</u> at 54.).

14

These facts, when viewed objectively and in totality, could clearly have led Officer Agarano to believe that the other party to the domestic dispute was in jeopardy.  Troy, by both parties accounts, was less than fully cooperative and appeared disinclined to allow the Officers to speak to his wife.  After the Officers insisted that they would not leave until they spoke with Jayzel, Troy called out for Jayzel but did not receive a response on two occasions.  The potentially dangerous nature of a domestic abuse call, Troy's apparent intoxication and grudging cooperation, the indication in the 911 call of physical violence, and Jayzel's failure to respond would have provided a trained professional such as Officer Agarano with sufficient cause for concern for the safety of both Jayzel and his fellow Officers, thus justifying his entry based on exigent circumstances.

This finding is buttressed by the Ninth Circuit's holding in Brooks, which presents facts similar to the instant matter.  In that case, police were called by a hotel guest who reported sounds of a woman being beaten in the room next door.  Brooks, 367 F.3d at 1135.  When the defendant opened the door, the officer noticed that the room was in disarray and, when the officer asked whether there had been an altercation, the defendant admitted that he knew the police would come because the woman had been "loud."  Id. at 1030.  After the officer asked to speak to the woman, the defendant indicated that she was probably in the shower.

15

Id.  The defendant then turned around toward the bathroom to ask the woman to

come out and, as a result, the hotel room door began to shut.  Id.  At that point, the

officer entered the room.  Id.

The Ninth Circuit found this entry was justified by an "objectively

reasonable belief that a woman might be injured and entry was necessary to

prevent physical harm to her."  Id. (internal quotation and citation omitted).

Therefore, exigent circumstances rendered the officer's entry lawful.  Here, Officer

Agarano knew even more than the officer in Brooks, owing to his substantial

interaction with Troy and his observation of Troy's demeanor.  Moreover, the

unanswered calls to Jayzel could have furthered Officer Agarano's reasonable

belief that Jayzel might have been non-responsive as a result of being seriously

injured.  Again, based on the compelling facts available to Officer Agarano and

established Ninth Circuit law, the Court finds Officer Agarano's belief that his

warrantless entry was supported by exigent circumstances to be reasonable.  As

such, Officer Agarano is entitled to qualified immunity for his entry of the Mattos

residence.  For these reasons, Defendants' MSJ is GRANTED on this issue.[6]

_____

[6] Additionally, Defendants argue that the warrantless entry was lawful based
on implied consent and the "emergency doctrine."  Because the Court finds that
Officer Agarano is entitled to qualified immunity for his entry into the residence,
these arguments are moot.  The Court extends this rationale to its discussion of the
(continued...)

### b.  Officer Aikala and Officer Kunioka's Entries

Similarly, Officer Aikala and Officer Kunioka are entitled to qualified immunity for their entries of the residence, which occurred after Troy became upset that Officer Agarano was in his home.  Officers Aikala and Kunioka were aware of many, if not all, of the same facts known to Officer Agarano, plus were witness to Troy's angry reaction to Officer Agarano's entry.  Troy cursed at and moved towards Officer Agarano.  (Agarano Decl. ¶ 18.)  In conjunction with the facts already known to the Officers, as set forth in the section above, it would have been unreasonable for Officers Aikala and Kunioka to simply remain outside of the residence while Officer Agarano faced a potentially perilous situation inside the residence.  Accordingly, Officers Aikala and Kunioka are entitled to qualified immunity for their entries, which were premised upon exigent circumstances.  Defendants' MSJ is therefore GRANTED on this issue.

### c.  Officer MacKnight's Entry

Finally, Officer MacKnight's entry, which occurred after the other Officers were inside and after Jayzel had been shot with the Taser, was also supported by a reasonable belief that exigent circumstances existed.  Officer

---

[6](...continued)
other Officers' entries.

MacKnight was aware that the call was for domestic abuse and potential physical violence, that a hostile situation was developing subsequent to Jayzel's incapacitation, and that Troy was struggling and resisting Officer Agarano's attempts to arrest him.  These facts, viewed objectively, provided Officer MacKnight with sufficient justification to believe that exigent circumstances warranted his entry.  As such, Officer MacKnight is entitled to qualified immunity for his entry of the residence.  Defendants' MSJ is GRANTED as to this issue.

2. <u>The Arrests</u>

The Fourth Amendment requires that a law enforcement officer have probable cause to arrest an individual without a warrant.  <u>United States v. Jensen</u>, 425 F.3d 698, 704 (9th Cir. 2005).  Probable cause exists when, at the moment of arrest, the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information are sufficient to warrant a prudent person's belief that a suspect had committed or was committing an offense.  <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 471 (9th Cir. 2007).  A determination as to whether probable cause exists requires a practical, common-sense decision based on the totality of the circumstances.  <u>Jensen</u>, 425 F.3d at 704.  Probable cause may be based on the collective knowledge of all of the

18

officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom.  United States v. Hoyos, 892 F.2d 1387, 1392 (9th Cir. 1989).

        a. Troy's Arrest

     Troy was arrested and charged with harassment and resisting arrest. Defendants contend that Troy's arrest was supported by probable cause and Plaintiffs argue the contrary.  For the reasons set forth below, this Court agrees with Defendants.

     Under Hawai`i law, a person commits the offense of harassment if, with intent to harass, annoy, or alarm any other person, that person:

> (b) Insults, taunts, or challenges another person in a manner likely to provoke an immediate violent response or that would cause the other person to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another;
>
>     *             *             *
>
> (f) Makes a communication using offensively coarse language that would cause the recipient to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another.

Haw. Rev. Stat. § 711-1106.  In order to prove harassment against an officer, the abusive speech must generally be coupled with outrageous physical conduct, which exacerbates the risk that the officer's training and professional standard of

restrained behavior will be overcome such that the officer will be provoked into a violent response.  In re John Doe, 869 P.2d 1304, 1315 (Haw. 1994). "Belligerency, when combined with persistently outrageous and abusive conduct, which unreasonably interferes with an officer's performance of his official duties, may supply the basis for a charge of harassment."  State v. Faulkner, 637 P.2d 770, 774 (Haw. 1981).

In his report, Officer Agarano described the circumstances leading to Troy's arrest as follows: (1) upon seeing Officer Agarano in the residence, Troy raised his voice and said that he had not invited the police into his house (Agarano Decl. ¶ 16.); (2) Troy yelled, "But I never invite you guys in!" (Id. ¶ 17.); (3) Officer Agarano tried to calm Troy by saying that he could talk to Jayzel outside (Id.); (4) despite this, Troy continued yelling that the police were not invited into the house (Id.); (5) importantly, Troy moved deliberately towards Officer Agarano while waving his arms and hands in the air, yelling "F____ you!  F____ you guys!" (Id. ¶ 18.); and (6) when Troy was yelling and walking towards Officer Agarano, he was in front of Jayzel, thus preventing Officer Agarano from conducting his investigation into the domestic disturbance call.  (Id. ¶ 19.)

Based on Troy's angry verbal reaction, his deliberate movement toward Officer Agarano, and the fact that he was preventing access to Jayzel, it

was reasonable for the Officers to believe that probable cause existed to arrest Troy

for harassment.  Thus, the Officers are entitled to qualified immunity on this issue.

Similarly, Troy's arrest for resisting arrest was supported by probable

cause.  A person commits the offense of resisting arrest

> if the person intentionally prevents a law enforcement
> officer acting under color of the law enforcement
> officer's official authority from effecting an arrest by:
>
> (a) Using or threatening to use physical force against the
> law enforcement officer or another; or
>
> (b) Using any other means creating a substantial risk of
> causing bodily injury to the law enforcement officer or
> another . . . .

Haw. Rev. Stat. § 710-1026.

The facts here show that Troy, after witnessing Jayzel get shot with

the Taser, was ordered to place his hands behind his back.  (Police Report, Ex. 1, at

COM018.)  Instead, Troy began yelling at the Officers.  (Id.)  Officer Agarano

placed his hand on Troy's arm and, after initially appearing as if Troy would

comply, he instead began to pull his arm away and struggle with Officer Agarano.

(Id.)  Officer Agarano increased his level of force and told Troy not to resist.  (Id.)

After a short struggle in which Officer MacKnight also joined, Troy was

handcuffed and placed under arrest.  (Id.)

21

Plaintiffs contend that Troy's resistance constituted no more than a failure to cooperate and not an attempt to prevent his arrest. This attempted distinction is too narrowly drawn. *Prior* to the use of the Taser on Jayzel, Officer Agarano had informed Troy that he was under arrest. Following the use of the Taser, Officer Agarano instructed Troy to place his hands behind his back. In response to these commands, Troy was both verbally and physically resistant, culminating in a physical struggle following Troy's refusal to accede to Officer Agarano's attempt to place his hand on his arm to effectuate the arrest. Whether Troy was failing to cooperate or actually resisting his arrest is a distinction neither the parties nor this Court is qualified to make. The facts indicate that there was sufficient probable cause for the Officers to believe that Troy had committed the offense of resisting arrest. Accordingly, a reasonable officer could have believed that the arrest of Troy was lawful and, as a result, the Officers are entitled to qualified immunity on this issue. For these reasons, the Court GRANTS Defendants' MSJ with regard to probable cause for Troy's arrest.

b. Jayzel's Arrest

Jayzel was arrested and charged with harassment and obstructing government operations. In addition to the previous discussion of harassment

above, a person commits this offense if, with intent to harass, annoy, or alarm any other person, that person "[s]trikes, shoves, kicks or otherwise touches another person in an offensive manner or subjects the other person to offensive physical contact." Haw. Rev. Stat. § 711-1106(1)(a). Here, it is uncontested that, while allegedly attempting to prevent the arrest of Troy, Jayzel extended her arm and made contact with Officer Aikala. Plaintiffs' contention that Jayzel did not strike Officer Aikala with a closed fist is irrelevant based on the clear language of Haw. Rev. Stat. § 711-1106(1)(a). Plaintiffs' claim that there is no evidence that Jayzel was verbally or physically confrontational or aggressive to the Officers or that she was trying to escape is also irrelevant. The undisputed fact is that Jayzel made physical contact with Officer Aikala. While Jayzel's intent is unclear, the facts as known to the Officers at the time the arrest was made were sufficient to lead to the reasonable belief that probable cause existed for her arrest.

Jayzel was also charged with obstructing government operations. A person commits this offense

> if, by using or threatening to use violence, force, or physical interference or obstacle, the person intentionally obstructs, impairs, or hinders:
>
> (a) The performance of a governmental function by a public servant acting under color of the public servant's official authority;

(b) The enforcement of the penal law or the preservation of the peace by a law enforcement officer acting under color of the law enforcement officer's official authority or

(c) The operation of a radio, telephone, television, or other telecommunication system owned or operated by the State or one of its political subdivisions.

(2) <u>This section does not apply to</u>:

(a) <u>The obstruction, impairment, or hindrance of the making of an arrest</u>; [. . .]

Haw. Rev. Stat. § 710-1010 (emphasis added).

Plaintiffs argue that, because Jayzel's interference with the Officers' attempts to arrest Troy is precluded by the statutory language of Haw. Rev. Stat. § 710-1010, there can be no probable cause to support her arrest.  Defendants concede that Jayzel did not commit the offense of obstructing government operations but argue that Jayzel could have been arrested and charged with resisting arrest pursuant to Haw. Rev. Stat. § 710-1026 or hindering prosecution pursuant to Haw. Rev. Stat. § 710-1028(4).

Regardless, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004).  The fact that "the officer does not have the state of mind which is hypothecated by the reasons which provide the

legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Whren v. United States, 517 U.S. 806, 814 (1996) (internal quotation and citation omitted). In other words, probable cause exists neither independently nor in a vacuum. Here, for the reasons stated above, the Officers had probable cause to arrest Jayzel for harassment. The fact that she was later charged with an inapplicable offense does not retroactively dissolve the probable cause necessary to make the initial arrest. Because the Officers had probable cause to arrest Jayzel for harassment, the question of whether they had probable cause to arrest her for obstructing government operations is irrelevant. For these reasons, the Court GRANTS Defendants' MSJ with regard to the issue of probable cause for Jayzel's arrest.

3. Excessive Force

Plaintiffs contend that Officer Aikala's use of the Taser was excessive and violated Jayzel's Fourth Amendment right. Defendants claim that the use of the Taser was constitutionally valid. For the reasons set forth below, the Court finds that there are genuine issues of fact associated with this claim and it is therefore inappropriate for summary judgment.

The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the

circumstances facing them.  <u>Tennessee v. Garner</u>, 471 U.S. 1, 7-8 (1985).  Even

where some force is justified, the amount actually used may be excessive.  <u>Santos</u>

<u>v. Gates</u>, 287 F.3d 846, 853 (9th Cir. 2002).  When analyzing the reasonableness of

force used, the "nature and quality of the intrusion on the individual's Fourth

Amendment interests" must be balanced "against the countervailing governmental

interests at stake."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989) (internal

quotations and citations omitted).  The Ninth Circuit has set forth a three-step

analysis for determining reasonableness of force.  First, the court must assess the

"gravity of the particular intrusion on Fourth Amendment interests by evaluating

the type and amount of force inflicted."  <u>Miller v. Clark County</u>, 340 F.3d 959, 964

(9th Cir. 2003) (internal citation omitted).  Second, the court must assess the

importance of the government interest at stake by evaluating: (1) the severity of the

crime at issue; (2) whether the subject poses an immediate threat to the safety of

the officers or others; and (3) whether the subject is actively resisting arrest or

attempting to evade arrest by flight.  <u>Id.</u>  Third, the court balances the gravity of the

intrusion on the individual against the government's need for that intrusion to

determine whether it was constitutionally reasonable.  Moreover, "[t]he calculus of

reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments – in circumstances that are tense, uncertain,

and rapidly evolving – about the amount of force that is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 396-97.

Applying this analysis to the facts at hand, the Court first evaluates the type and amount of force inflicted.  Officer Aikala discharged his Taser at Jayzel's torso and the Taser cycled for five seconds.  (Aikala Decl. ¶ 10.)  Jayzel slowly fell to the floor and on to her back.  (<u>Id.</u> ¶ 11.)  Jayzel described the incident as causing an "incredible burning and painful feeling locking all of my joints, muscles and falling hard on the floor.  I was unable to open my eyes but just heard myself screaming in incredible pain for what seemed forever.  I felt myself shaking and hitting the frame of the entertainment center . . . with my entire body locked and paralyzed."  (Decl. of Jayzel Mattos ("Jayzel Decl."), Ex. 3 at 3-4, attached to Pls.' Mot. for Summ. Judg.)  While the extent of Jayzel's injuries resulting from the incident is disputed, it appears that she was significantly impacted.  (<u>See id.</u> at 8 (stating that Jayzel was out of work as a result of her injuries for over one week).)  Taken together, these facts indicate that the use of the Taser on Jayzel was, at a minimum, a significant use of force.

Second, in assessing the importance of the government interest at stake, the Court must analyze: (1) the severity of the crime at issue; (2) whether the subject poses an immediate threat to the safety of the officers or others; and (3)

whether the subject is actively resisting arrest or attempting to evade arrest by flight. Miller, 340 F.3d at 964. The Court identifies the government interest at stake here as the effectuation of what the Officers believed was a lawful arrest of Plaintiffs while maintaining an environment that was safe for the Officers, Plaintiffs, and the other people in the residence (the Mattos' children).

While Jayzel's actions in attempting to frustrate the arrest of Troy were relatively minor in terms of criminal severity, they exacerbated an already tense, and rapidly escalating, situation. This had the effect, in conjunction with Troy's hostile behavior, of creating an increasingly dangerous situation for the Officers. Regardless of whether Jayzel herself posed an immediate physical threat to the Officers, her actions could reasonably be interpreted as contributing to a threatening situation. Moreover, while Jayzel was not resisting her own arrest, she was actively resisting the arrest of her husband. In sum, leading up to the use of the Taser, Officer Aikala had reasonable grounds to believe that Jayzel had engaged in criminal activity (i.e. harassment) when she made physical contact with him, was exacerbating a hostile situation, and was impeding the arrest of Troy. The Court therefore determines that the government interest at stake here was also significant.

Third, the Court must balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether the use of the Taser was constitutionally reasonable. Here, because both the intrusion on Jayzel and the government's need for the intrusion can be construed as significant, it is unclear which way the balance of equities tips on the issue of force. It is undisputed that Jayzel's actions were inappropriate and dangerous. It is also possible, however, that Officer Aikala's use of the Taser was disproportional to the gravity of the threat. The Officers outnumbered Plaintiffs two-to-one and Jayzel, after initially trying to diffuse the situation with entreaties to discuss the matter outside, was not actively threatening the Officers. It is also unclear to this Court, based on the differing accounts given by Officer Aikala and Jayzel, the nature and scope of the warning provided by Officer Aikala before the Taser was employed. While the Court recognizes that police officers face a panoply of difficult choices, often requiring immediate resolution, when faced with the question of whether the use of force is warranted and, if so, to what degree, the Court cannot say as a matter of law that Officer Aikala's use of the Taser was reasonable under the circumstances. Rather, the Court finds that questions of fact exists regarding whether the use of the Taser on Jayzel was constitutionally reasonable. Defendants' MSJ on the issue of excessive force is therefore DENIED.

29

C. <u>Plaintiffs' § 1983 Claim against the County</u>

The County argues that the § 1983 claim is meritless because the Officers' actions were appropriate and did not violate Plaintiffs' constitutional rights. <u>See</u> <u>Scott v. Henrich</u>, 39 F.3d 912, 916 (9th Cir. 1994) ("the liability of municipalities . . . is contingent on a violation of constitutional rights. . . . municipal defendants cannot be held liable [where] no constitutional violation occurred."). However, as set forth above, this Court has found that there is a question of fact of whether the Officers' use of the Taser was excessive force and violated Jayzel's Fourth Amendment rights.

The County next argues that Plaintiffs' § 1983 claim should be dismissed because Plaintiffs have no evidence of a policy or custom that encourages illegal entries or inappropriate use of the Taser. To establish a claim under § 1983 for municipal liability, the plaintiff must establish that the alleged constitutional violation was committed pursuant to a formal policy or custom that constitutes the standard operating procedure; that an official with final policy-making authority committed the constitutional tort; or "that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1346-47 (9th Cir. 1992); <u>see</u> <u>Monell v. Dep't of Social Servs. of City of N.Y.</u>, 436 U.S. 658, 690-91 (1978).

"[T[he word 'policy' generally implies a course of action consciously chosen from among various alternatives." <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985). The word custom recognizes situations where the practices of officials are permanent and well settled. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 167-68 (1970).

Plaintiffs claim that the County has a longstanding policy or custom with respecting to illegal entries and inappropriate use of the Taser. Indeed, Plaintiffs' counsel maintains that he hopes to make this case a class action and that he is attempting to locate others who may have been subjected to illegal entry or inappropriate use of the Taser. Plaintiffs' counsel also maintains that he has not been provided with all requested discovery. Because Plaintiffs have not had an opportunity to view all discovery on the "custom and policy" issue, this Court is not in a position to rule on this claim. For these reasons, Defendants' MSJ on Plaintiffs' § 1983 claim is DENIED WITHOUT PREJUDICE.

D.  <u>Plaintiffs' State Law Claims against the County</u>

Plaintiffs have brought a claim against the County for negligent training and supervision. A municipality is "subject to the state's tort laws in the same manner as any other private tortfeasor may be liable for state law torts that its agents committed." <u>Kahale v. City and County of Honolulu</u>, 90 P.3d 233, 241

(Haw. 2004); see also Lauer v. Young Men's Christian Ass'n of Honolulu, 557 P.2d 1334, 1341 (Haw. 1976) (holding that a municipality may be liable "on the same principles which impose liability on a non-municipal principal for the tortious conduct of its agents").  Under a respondeat superior theory of liability, an employer, including the City, may be held liable for the negligent acts of its employees if the acts occur within the scope of the employees' employment, even if the foreseeable effects of the acts occur outside the scope of employment.  See Wong-Leong v. Hawaiian Indep. Refinery, Inc., 879 P.2d 538, 543-44 (Haw. 1994).  The State of Hawaii even recognizes a respondeat superior theory that holds a municipality liable for the tortious acts of its agents that are committed with "malice" within the scope of the agents' employment.  See Lane v. Yamamoto, 628 P.2d 634, 636 (Haw. Ct. App. 1981).  Thus, even if a public official acts with malice, the City still may be held liable if the act was completed within the scope of his or her employment.  A municipality cannot be held liable, however, for punitive damages.  See id. at 1342.

To establish negligence, Plaintiff must demonstrate a duty, breach of that duty, legal causation, and actual injury and, for respondeat superior to apply, that the act occurred within the scope of the employee's employment.  See id.; Doe Parents No. 1 v. State Dep't of Educ., 58 P.3d 545, 579 (Haw. 2002).  A public

officer, such as the director of an agency, acting within his official capacity also may be held individually liable for damages for acts committed within his employment if he commits the tort with malice or maliciously exercises his official discretion.[7]  See <u>Kajiya v. Dep't of Water Supply</u>, 629 P.2d 635, 640 (Haw. Ct. App. 1981).  If the public official was acting within his individual capacity, he may be held liable for committing the tort, with or without a showing of malice.  See <u>id.</u>

Additionally, under certain circumstances, a failure to train may create municipal liability.  See <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 380 (1989).  A failure to train can provide a basis for municipal liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officials] come in contact."  <u>Id.</u> at 388-89.  The question is twofold: (1) whether the training program, if one in fact existed, is adequate; and if not, (2) "whether such inadequate training can justifiably be said to represent 'city policy.'"  <u>Id.</u> at 390.

Defendants argue that there is no causation here because the Officers actions were lawful and, as a result, Plaintiffs' claims for negligent training and supervision fail as a matter of law.  For the reasons discussed above, this argument

---

[7] The Court did not apply this rule to the managing director because Plaintiff did not allege any facts that would prove that the managing director acted with malice or acted in any other tortious way.

is germane only to the claims on which the Court determined there were no issues of material fact (i.e. the entry and the probable cause underlying the arrests). Because the Court determined that there was a genuine issue of fact as to the issue of excessive force, a determination on Plaintiffs' negligent training and supervision claim, as it relates to the force issue, is premature at this time.  Accordingly, this Court is not in a position to grant summary judgment in favor of the County on this claim.  For these reasons, Defendants' MSJ is DENIED WITHOUT PREJUDICE as to Plaintiffs' negligent training and supervision claim.

E.  <u>Plaintiffs' Punitive Damages Claim</u>

Plaintiffs have brought a claim for punitive damages against the Officers and the County.  Both the United States Supreme Court and the Hawai`i Supreme Court have held that it is contrary to public policy to impose punitive damages on municipalities.  <u>Newport v. Facts Concerts, Inc.</u>, 453 U.S. 247, 271 (1981) (municipality is immune from punitive damages under 42 U.S.C. § 1983); <u>Lauer v. Young Men's Christian Assoc.</u>, 557 P.2d 1334 (Haw. 1976) (municipalities cannot be liable under common law for punitive or exemplary damages).  Accordingly, Defendants' MSJ as to Plaintiffs' claim for punitive damages against the County is GRANTED.

To obtain punitive damages, a plaintiff must show that the defendant's conduct was motivated by an evil motive or intent or it involved reckless or callous indifference to the constitutional rights of others.  <u>Dang v. Cross</u>, 422 F.3d 800, 807 (9th Cir. 2005).  Based on its discussion of the Officers' potential liability for constitutional violations, the Court GRANTS Defendants' MSJ on Plaintiffs' entry and probable cause claims for punitive damages.  On the issue of excessive force, however, there is still a question of fact and, as a result, a final determination on the issue of punitive damages would be premature at this juncture.  As such, Defendants' MSJ on Plaintiffs' punitive damages claim is DENIED WITHOUT PREJUDICE.

II.  <u>Plaintiffs' Partial MSJ</u>

Plaintiffs contend that they should be granted judgment as a matter of law on their claims against Officers Agarano, Aikala, Kunioka, and MacKnight for violations of their Fourth Amendment rights stemming from the events of August 23, 2006.  Plaintiffs offer three arguments in support of this position: (1) Defendants' warrantless entry into Plaintiffs' home constituted an unlawful entry

not supported by exigent circumstances; (2) Plaintiffs were arrested without probable cause; and (3) Defendants used excessive force on Jayzel.

As set forth in Parts I.B.1 and I.B.II above, the Court found that Defendants are entitled to judgment as a matter of law on Plaintiffs' unlawful entry and probable cause claims because the Officers are entitled to qualified immunity on these claims.  In addition, the Court adopts its reasoning from Part I.B.III for purposes of Plaintiffs' Partial MSJ and reiterates its determination that genuine issues of material fact exist as to Plaintiffs' excessive force claim.  For these reasons, the Court DENIES Plaintiffs' Partial MSJ.

36

CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and

DENIES IN PART WITHOUT PREJUDICE Defendants' MSJ and DENIES

Plaintiffs' Partial MSJ.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 20, 2008.

_____
David Alan Ezra
United States District Judge

Mattos et al. v. Agarano et al., CV No. 07-00220 DAE BMK; ORDER GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY OF DEFENDANTS DARREN AGARANO, RYAN AIKALA, STUART KUNIOKA, AND HALAYUDHA MACKNIGHT FOR VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS